UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA                           Crim. No. 11-096 (RHK/LIB)

            Plaintiff,

v.                                                          **REPORT AND**
                                                       **RECOMMENDATION**
JEFFREY ALLEN STOLTZ,

            Defendant.

---

The above matter came before the undersigned United States Magistrate Judge upon the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure; Defendant's Motion to Suppress Statements, Admissions, and Answers; and Defendant's Motion to Suppress Eyewitness Identifications. The Motions have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. A hearing was conducted on May 4, 2011, at which time the Defendant appeared personally, and by Caroline Durham, Assistant Federal Defender, and the Government appeared by Andrew Dunne, Assistant United States Attorney. For the reasons that follow, it is recommended that the Defendant's Motions be denied.

## I.      BACKGROUND

On March 15, 2011, Defendant Jeffrey Allen Stoltz was indicted on one count of being a felon in possession of a firearm. The following factual findings are based upon the testimony and exhibits offered at the evidentiary hearing that was held on May 4, 2011.

### A.      The Traffic Stop

On the morning of November 16, 2010, Special Agent Steve Parshall of the Minnesota Bureau of Criminal Apprehension, and Special Agent Scot Umlauf of the Douglas County Sheriff's Department and the West Central Minnesota Drug Task Force, were assisting police in the investigation of a narcotics overdose death that had occurred at a hotel in the City of Alexandria in Douglas County, Minnesota.  The police had responded to a 911 call reporting a medical emergency and upon arrival on the scene, the police found a man dead from an apparent drug overdose.  Based on information provided by witnesses, Umlauf and Parshall believed that a man name Anthony White had provided the deceased with a syringe containing methamphetamine and that he fled the scene when the deceased started to seize from an overdose.

Umlauf testified that White was a known drug user and dealer.  Umlauf knew that White often stayed at a residence located in the City of Lowry in Pope County, Minnesota, which is approximately 15 to 20 miles from Alexandria, and that the residence was known to be involved with narcotics.  Parshall contacted Deputy Jason Sorenson of the Pope County Sheriff's Department to inform him that White, who was believed to be involved in a drug overdose death in Alexandria, may be travelling to a residence on Aurora Avenue in the City of Lowry.  Parshall also stated that White was last seen in a gold-colored, 4-door sedan and asked Sorenson to keep a look out for the vehicle.  Sorenson testified that he was familiar with the Aurora Avenue residence and that he had been involved in an incident in which an individual leaving that residence was stopped with methamphetamine in his or her possession.

Following his conversation with Parshall, Sorenson began looking for the gold sedan. During one of his patrols, Sorenson observed a green Ford Explorer parked at the Aurora Avenue residence.  Dispatch reported that the vehicle was owned by Ingrid Stanley and that she had a

revoked driver's license.  Sorenson was not familiar with Ingrid Stanley, so he contacted Parshall to see if she was a person of interest.  Parshall informed him that Stanley had a history of dealing and using narcotics.

A short time later while on routine patrol, Sorenson again encountered a green Ford Explorer similar to the vehicle he had seen at the Aurora Avenue residence.  Sorenson testified that he met the vehicle head-on and observed that the vehicle did not have a front license plate.  Sorenson looked back at the vehicle after it passed to see if the license plate could be verified, and he believed that it was the vehicle he had checked earlier while conducting surveillance at the Aurora Avenue residence.  Sorenson turned his squad car around and got behind the vehicle heading eastbound on Highway 55 heading out of Lowry.  He ran the license plate with Pope County dispatch, which verified that the vehicle belonged to Ingrid Stanley and that she had a revoked license.  Sorenson testified that he was not aware if Ms. Stanley was actually driving the vehicle and that it was possible the driver was male.

Sorenson then turned on his overhead red lights to initiate a traffic stop, and the driver of the Ford Explorer pulled the vehicle to the side of the road, and Sorenson pulled his squad in behind the vehicle.  Sorenson testified that his initial purpose in pulling the vehicle over was to issue a citation for failure to display a front license plate in violation of Minnesota law.  He exited his squad and walked up to the driver's side door in order to talk to the driver; as he approached, he observed two large dogs in the vehicle.

The driver rolled down his window, and Sorenson asked for a driver's license and proof of insurance.  The driver stated that he did not have proof of insurance or a driver's license with

him.  The Defendant stated that there were new plates for the vehicle at home but he had not put them on the vehicle yet.

Sorenson observed that the driver appeared to be nervous, as he was stuttering and his right hand was shaking.  Because he was concerned about the excitement of the dogs, Sorenson asked the driver if he would mind stepping out of the vehicle so that he could take down the driver's information.  The driver refused to get out of the vehicle.  From inside the vehicle, the driver stated that his full name was David Michael Stoltz and that his date of birth was October 12, 1965.  Sorenson went back to his squad car to check the information the driver had provided. Pope County dispatch informed him that David Stoltz was a valid Minnesota driver.  Sorenson began filling out a citation for no proof of insurance.

Around this time, Parshall and Umlauf arrived separately in Lowry for the purpose of looking for White.  Parshall informed Umlauf that Sorenson was currently executing a traffic stop of the green Ford Explorer on Highway 55, and they proceeded to the location of the traffic stop. Parshall arrived on the scene of the traffic stop first, and Umlauf arrived a couple of minutes later.   Sorenson was sitting in his car writing out the citation when they approached him and they began discussing the details of the traffic stop. Sorenson reported that the driver was David Stoltz and that he had a valid driver's license.

Umlauf testified that he immediately became suspicious that the driver had given Sorenson a false name because he suspected that the driver was in fact Jeffrey Stoltz.  Umlauf was aware that Jeffrey Stoltz was living with Ingrid Stanley, who was the owner of the vehicle, in a residence outside the City of Brandon.  Umlauf looked through the back window of the vehicle but was unable to confirm that the driver was Jeffrey Stoltz.

Sorenson then asked Parshall to run the full name and date of birth that had been provided by the driver on his mobile computer in order to determine if the driver had provided a false name and date of birth.[1]  Upon viewing the photograph of David Stoltz provided by Driver and Vehicle Services (DVS), the officers did not believe that the driver was David Stoltz.  The officers agreed that they should get the driver out of the vehicle so that they could better compare the driver with photographs of David Stoltz and Jeffrey Stoltz, in order to be certain that the driver had provided a false name before they proceeded with an arrest.

Umlauf advised Sorenson that he should be careful because Jeffrey Stoltz, whom Umlauf suspected the driver to be, was known to have possessed weapons in past encounters with law enforcement.  Sorenson again approached the Ford Explorer on the driver's side and told the driver that he needed to exit the vehicle because the officers wanted to verify the driver's identity.  In order to ensure officer safety, Sorenson conducted a pat-down search of the driver after he exited the vehicle.  Sorenson testified that the driver was not under arrest at that point but it was clear that he was not free to leave.

Sorenson testified that he felt a large object in the driver's left coat pocket.  He immediately knew that it was not a weapon and believed it was a digital scale commonly used to weigh narcotics.  Sorenson asked the driver if the object was a scale, and the driver confirmed that it was.  Sorenson removed the scale from the driver's pocket and placed it on the hood of Parshall's squad car.

Umlauf stood in front of Parshall's squad car with the driver while Sorenson and Parshall compared the driver with the DVS photographs of Jeffrey Stoltz and David Stoltz.  Both

---

[1]       Sorenson does not have this capability in his squad car.

Sorenson and Parshall believed that the driver was Jeffrey Stoltz based on their comparison, and consequently, they concluded that the driver had given Sorenson a false name and date of birth.

Umlauf testified that once he viewed the driver outside the vehicle he immediately recognized and knew the driver to be Jeffrey Stoltz. However, he wanted Sorenson, as the arresting officer, to be confidant that they had Jeffrey Stoltz. Although he had not seen Jeffrey Stoltz in person recently, Umlauf testified that he had recently seen photographs of Stoltz in connection with investigations of the residence he shared with Stanley. According to Umlauf, law enforcement suspected that Stoltz and Stanley were selling narcotics from their residence. Umlauf stated that it had probably been a few weeks or a few months since he had last seen a photograph of Stoltz.

While Umlauf stood with the driver outside Parshall's squad car, the driver's cell phone rang, and Umlauf asked the driver not to answer the call. The driver stated that he was going to answer the call unless he was under arrest, and Umlauf responded by telling the driver that he was under arrest. Umlauf testified that he told the driver not to answer the call because he did not want him communicating with other individuals involved with narcotics about the traffic stop. Umlauf did not handcuff the driver but grabbed the driver's arm. Sorenson then came around and placed the driver under arrest for providing law enforcement with a false name. During his testimony at the evidentiary hearing, Sorenson identified the Defendant Jeffrey Allen Stoltz as the driver of the vehicle.

At that time, Sorenson conducted a search incident to arrest, during which he found $741.00 in cash on the Defendant's person. The Defendant was then handcuffed and placed in the back of Sorenson's squad car. Parshall and Umlauf performed a field test of the digital scale,

which tested positive for methamphetamine.  The officers then called a tow truck to come to the location with the intent of getting a search warrant for the vehicle the following day.

Parshall and Umlauf stayed with the vehicle while Sorenson transported the Defendant to the Pope County Sheriff's Office, where he was booked for fifth degree possession of a controlled substance and for giving a false name to a police officer.  After booking, Sorenson advised the Defendant of his Miranda rights.  The Defendant waived his Miranda rights and Sorenson proceeded with an interview.  (Govt. Exhs. 1A and 1B).

When the tow truck arrived at the scene, Parshall followed the vehicle to the impound lot where he locked the vehicle and sealed it with evidence tape.

### B.    The Search Warrant

On November 17, 2010, Umlauf applied for a search warrant, which was signed by Pope County District Judge Jon Stafsholt on that same date.  (Govt. Exh. 2).

In his affidavit supporting the search warrant, Umlauf stated he that was working as the Special Agent in Charge of the West Central Minnesota Narcotics Task Force, a position he has held for over five years.  He advised that he has more than 16 years of experience as a police officer, that he has more than six years of narcotics related experience, and that he has extensive training and experience in crimes related to the production, sale, and distribution of narcotics.

Umlauf related that he and Parshall assisted Sorenson with a traffic stop on November 16, 2010, on Highway 55 in Pope County.  Umlauf stated that Sorenson stopped a vehicle with Minnesota license plate VWG887 for failure to display a front license plate, and that Umlauf had learned while speaking with Sorenson that the driver had provided the name of David Michael

Stoltz with a date of birth of October 12, 1965, and that he was driving Ingrid Stanley's vehicle. Umlauf stated that he was aware that Stanley is currently living with the Defendant, and accordingly, he informed Sorenson that the driver had provided a false name and date of birth.

In his affidavit, Umlauf stated that Sorenson asked the Defendant to exit the vehicle. He stated that Sorenson recovered a scale from the Defendant's left front pocket during a protective patdown search. Umlauf stated that Parshall and Sorenson compared the DVS photographs to the Defendant. He recounted the cell phone call that prompted Umlauf to inform the Defendant that he was under arrest. Umlauf stated that he was sure the driver had given a false name and that the driver was in fact Jeffrey Stoltz. Umlauf stated that the Defendant was then handcuffed and placed in Sorenson's squad car.

Umlauf further stated that the officers knew that the Defendant had just left a known drug dealer's residence in the City of Lowry. Umlauf stated that on November 2, 2010, an individual was stopped leaving that residence and found to be in possession of 7 grams of methamphetamine. Umlauf advised that it was his belief that the Defendant was involved in a narcotics transaction at the residence in Lowry shortly before he was pulled over. Umlauf advised that the scale tested positive for methamphetamine during a field test and that Sorenson had found $741.00 in cash on the Defendant, which was consistent with narcotics dealing. Umlauf further stated that multiple confidential informants had informed law enforcement that the Defendant and Ingrid Stanley were selling methamphetamine from their residence located north of the City of Brandon, Minnesota. Umlauf stated that he obtained a criminal history for the Defendant, which contained charges of smuggling marijuana into the Douglas County Jail in 1981; fifth degree controlled substance in 1997; an un-coded drug charge in 1999 in Douglas County; and incarceration with the Minnesota Department of Corrections in 2003 for possession

of a firearm and fleeing a peace officer.   Umlauf stated that, based on this information, he believed the Defendant was trafficking narcotics in the Ford Explorer when he was pulled over. Umlauf stated that he had good reason to believe that the vehicle contained evidence of narcotics crimes, and accordingly, he requested a search warrant for the vehicle.

The search warrant signed by Judge Stafsholt authorized the search of a 1994 green Ford Explorer register to Ingrid Marie Stanley with a date of birth of October 6, 1975.   The search warrant indicated that the vehicle, which displayed Minnesota license plate VWG887 and VIN No. 1FMDU34X2RUD34322, was currently located at BK Towing in Glenwood, Minnesota.

## C.     The Search of the Vehicle

On that same date, Parshall and Umlauf went to BK towing, where the vehicle was still being held, in order to execute the search warrant.   Parshall photographed the vehicle in the secured garage area to show that the evidence tape was still intact.   The officers then cut the tape and proceeded to conduct a search of the vehicle described in the search warrant.

During the search, the officers found a wallet between the driver's seat and the center console, which contained the Defendant's Minnesota driver's license.   Within the wallet, Parshall also found two pieces of folded yellow paper in the wallet, which were revealed to be pawn receipts from Viking Pawn Shop in Alexandria.   The Defendant's name was on the receipts.   The first receipt indicated that on June 29, 2010, the Defendant had pawned a Benelli firearm with serial number 2005DU0579.   (Def. Exh. 1).   The second receipt indicated that the Defendant pawned a Ruger .22 semi-automatic rifle with serial number 352-18048, also on June 29, 2010.   (Def. Exh. 2).   Parshall testified that, based on his training and experience, he knew that Benelli and Ruger were firearm manufacturers, and accordingly, he concluded that the

Defendant had pawned two firearms on June 29, 2010.  Parshall knew that the Defendant was not permitted to possess firearms due to a prior criminal conviction, so he seized the pawn tickets as possible evidence that the Defendant had unlawfully possessed a firearm.

During the search, the officers also found four syringes and trace amounts of methamphetamine in the carpet on the floor of the vehicle.  Umlauf testified that he believed the methamphetamine had been dumped onto the floor for concealment.  They seized the trace amounts of methamphetamine found on the carpet and also cut out a piece of the carpet containing the methamphetamine.

### D.    The Photo Identification

Following the execution of the search warrant, Umlauf asked Parshall to follow-up the seizure of the pawn tickets with employees at the Viking Pawn Shop.  On November 17, 2010, Parshall met with Mr. Tillburg and Ms. Collins, who are employees of the pawn shop. He was accompanied by Sheriff's Deputy Kent Andersen.

When asked about the standard procedure for firearms transactions, the employees indicated that they ask for the customer's driver's license.  The employees physically record the customer's name and driver's license number and then return the form to the customer for completion of the remainder of the form.

Next, Parshall showed the employees photocopies of the pawn receipts he had seized from the Defendant's wallet, and they indicated that they recognized the receipts because the customer had recently returned to the store.  The employees represented that the transaction was fresh in their mind because on November 2, 2010, the customer had tried to get the guns back.  However, he had refused to submit to a NICS check, which is required for every firearms

- 10 -

transaction.[2]  After refusing to submit to the NICS check, the customer brought in an individual

by the name of Jason Roers, who submitted to the NICS check in his place.  However, Mr. Roers

failed the check and was refused possession of the firearms.  In addition, the employees

represented that they were familiar with the Defendant generally, and that they were also familiar

with his girlfriend Ingrid Stanley, who had recently been to the shop to pay off and retrieve an

item.

Parshall then showed the employees the Defendant's DVS photograph.  (Govt. Exh. 5).

They both agreed that the picture was of the Defendant, and they were both certain that the

person in the photograph was the same person who had pawned the firearms reflected in the two

receipts.  Parshall only presented the pawn shop employees with one photograph.  The

employees provided Parshall with the original pawn shop receipts.  (Govt. Exh. 3 and 4).

II.     DISCUSSION

    A.     Motion to Suppress Evidence Obtained from Search and Seizure

The Defendant argues that evidence seized from his person during the traffic stop must be

suppressed because it was obtained in violation of his Fourth Amendment rights.  In the present

case, there were two searches of the Defendant's person – the initial patdown search when he

exited the vehicle, and a search incident to his arrest.

    1.     Evidence Seized Before the Defendant's Arrest

---

[2]     Parshall testified that every customer must fill out ATF form 4473, which is used to
ensure that individuals with felony convictions are not permitted to purchase or take possession
of firearms.  This form is then used to conduct the federal "NICS" check (National Instant
Criminal Background Check System).

As a threshold matter, the Court must determine if the initial traffic stop violated the Defendant's Fourth Amendment rights.

While a pretextual traffic stop violates the Fourth Amendment, it is well-established "that **any** traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001)[citations omitted]. "In deciding whether a stop was pretextual or based on probable cause, the district court applies an 'objectively reasonable' standard." United States v. Chatman, 119 F.3d 1335, 1340 (8th Cir. 1997), cert. denied, 522 U.S. 976 (1997). "So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995). See also, United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008)("Whether a traffic stop is appropriate is not affected by an officer's subjective motivations.")

In the present case, the vehicle the Defendant was driving did not have a front license plate displayed, which is a violation of Minnesota traffic laws and a valid reason to stop a vehicle. See Minn.Stat. §§ 169.79, Subd. 1 and 6 ("one [license] plate must be displayed on the front and one on the rear" of every motor vehicle). The record establishes that Sorenson had evidence of a traffic violation, and accordingly, his decision to stop the Defendant was objectively reasonable. The fact that the Sorenson may have been interested in the driver for other reasons, such as his possible involvement in narcotics use or distribution, is irrelevant.

Second, having made a valid traffic stop, an officer may conduct a "reasonable investigation," which includes "asking for the driver's license and registration, requesting that

CASE 0:11-cr-00096-RHK-LIB   Document 48   Filed 06/03/11   Page 13 of 26

the driver sit in the patrol car, and asking the driver about his destination and purpose." United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995), cert denied, 516 U.S. 936 (1995)(quoting United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994)).   Here, Sorenson's initial questioning of the Defendant was reasonable and appropriate; he simply asked for the Defendant's driver's license and proof of insurance and whether he was aware that there was no front license plate displayed on the vehicle.   See, e.g., United States v. Smart, 393 F.3d 767, 771 (8th Cir. 2005)("The officer's request for Mr. Smart's license and registration was reasonably related to confirming the registration status of the vehicle and determining whether the lack of a front license plate was a violation of Iowa law"), cert. denied, 545 U.S. 1121 (2005); Jones, 275 F.3d at 680 (asking for driver's license and registration is a reasonable part of a lawful traffic stop).   In addition, Sorenson was clearly justified in contacting dispatch to verify the information that was provided by the Defendant.   See, United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999)("having made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning"), cert. denied, 528 U.S. 1161 (2000).

The Defendant challenges the patdown search of his person that led to the discovery of the digital scale in his pocket, which resulted from the officer's investigation of the Defendant's identity.   If, during a traffic stop, an officer develops a reasonable, articulable suspicion that criminal activity has occurred or is occurring, "he has 'justification for a greater intrusion unrelated to the traffic offense.'"   United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005)(quoting Bloomfield, 40 F.3d at 918); see also, United States v. Long, 320 F.3d 795, 800

(8th Cir. 2003)("an investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop.") "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" Sanchez, 417 F.3d at 975 (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)). "[T]he proper scope of an investigative detention depends upon the purposes of the stop and requires using the least intrusive means reasonably available to achieve those purposes." United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986), cert. denied, 479 U.S. 861 (1986) (citing United States v. Jones, 759 F.2d 633, 642 (8th Cir. 1985)).

The Court finds that the inquiry conducted by the officers in this case was within the proper scope of a lawful investigative stop. Although Sorenson was not initially suspicious that the Defendant provided a false name, the officer developed a reasonable, articulable suspicion that he had in fact provided a false name after Umlauf arrived on the scene. Based on his knowledge and experience, Umlauf did not belief that David Stoltz would be driving Ingrid Stanley's vehicle. Umlauf was familiar with both Ingrid Stanley, as the owner of the vehicle, as well as the Defendant, and he was aware that they were living together in a nearby town. This information provided a reasonable basis for believing that the driver of the vehicle may have provided a false name. Accordingly, at that point the police were justified in prolonging the traffic stop in order to determine if the Defendant had committed the crime of providing a false name to a police officer. See, United States v. Cloud, 594 F.3d 1042, 1045 (8th Cir. 2010)("a lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification.") The Defendant does not

contend and there is no evidence to support that the officers prolonged the traffic stop by an unreasonable amount of time during their investigation of the Defendant's identity, and the evidence demonstrates that the Defendant's arrest was made within a few minutes of his exit from the vehicle.  See, e.g., United States v. Gregory, 302 F.3d 805, 810 (8th Cir. 2002)(no evidence that dog sniff of vehicle was unduly lengthy as the record established that twenty minutes elapsed between the beginning of the traffic stop and the completion of the dog sniff), cert. denied, 538 U.S. 992 (2003).

In addition, in conducting an investigation into the Defendant's identity, the officers were permitted to ask the Defendant to exit the vehicle.  "Officers who have conducted a lawful Terry stop of a vehicle may order the driver to exit the vehicle pending completion of the stop." United States v. Spotts, 275 F.3d 714, 719 n. 2 (8th Cir. 2002)[citing cases].  Not only were the officers justified in ordering the Defendant to exit the vehicle pursuant to a valid traffic stop, it was also necessary to conducting an accurate assessment of the Defendant's identity.

The Court also finds that the officers were permitted to conduct a patdown search of the Defendant upon his exit from the vehicle.  "After stopping a suspect, officers may take such 'additional steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"  United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001) (quoting Doffin, 791 F.2d at 120).  "A police officer who has legitimate contact with another person, and who has reason to believe that person may be armed and dangerous, may conduct a pat-down search to protect officer safety, regardless of whether there is probable cause to arrest."  United States v. Menard, 95 F.3d 9, 10-11 (8th Cir. 1996)(noting that traffic stops pose an inherent danger to police, making it likely that minimally intrusive weapons searches will be found reasonable) (citing Terry v. Ohio, 392 U.S. 1, 27 (1968)).  "[T]he 'officer need not

be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"  United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2002), cert. denied, 537 U.S. 879 (2002) (quoting Terry, 392 U.S. at 27).

Here, the evidence establishes that Sorenson's patdown search of the Defendant was justified by a reasonable, articulable suspicion.  The officer's investigation required that the Defendant exit the vehicle, and Umlauf knew from past experience that Jeffrey Stoltz, who they suspected was the driver, had been in possession of weapons during previous encounters with the police.  Given the Defendant's past history, Sorenson was reasonably concerned that the Defendant might be armed and dangerous.  See, United States v. Hughes, 15 F.3d 798, 802 (8th Cir. 1994)(protective patdown search was justified where police officers were aware that the defendant had a history of carrying weapons).  Under all the circumstances, and viewed objectively from the standpoint of a reasonably cautious police officer, Sorenson conducted a lawful protective patdown search of the Defendant.

During the patdown search, Sorenson felt an object in the left front pocket of the Defendant's jacket.  In Minnesota v. Dickerson, 508 U.S. 366, 375 (1993), the Supreme Court held that "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons."  In the present case, Sorenson immediately recognized that the object was likely a digital scale of the kind that is commonly used in narcotics transactions, and the Defendant confirmed that it was a scale before it was removed from his pocket.  There is no evidence that the object was subject to manipulation, and therefore, Deputy Sorenson was permitted to seize the item as likely

containing contraband.  See, Hughes, 15 F.3d at 802 (where the officer immediately recognized the object as crack cocaine based on plain feel, the officer was permitted to seize the object).

Even if the patdown search or the seizure of the scale was a violation of the Fourth Amendment, the Court would nevertheless find that the inevitable-discovery exception to the exclusionary rule renders the evidence admissible.  Under the inevitable discovery doctrine, if evidence "otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply." United States v. James, 353 F.3d 606, 616-17 (8th Cir. 2003) (citing Nix v. Williams, 467 U.S. 431, 444 (1984)).  "To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."  United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997) (citing United States v. Wilson, 36 F.3d 1298, 1304 (5th Cir. 1994)).

As described in the next section, the officers conducted a search incident to a lawful arrest for the crime of providing a false name to a police officer.  Clearly, the crime for which the officers arrested the Defendant had no relationship to and was independent of the discovery of the scale. The officers did not alter their intended course of action based on the discovery of the scale, and they clearly would have discovered the Defendant's identity even if the scale had not been seized.  Moreover, the fact that the Defendant was also booked on narcotics charges is irrelevant, because the decision to arrest was not based on his possession of narcotics.

Accordingly, the inevitable-discovery exception applies, and the scale is not subject to suppression.

In sum, the officers' conduct prior to the Defendant's arrest did not violate his Fourth Amendment rights.  Therefore, the exclusionary rule should not apply to any of the evidence obtained prior to his arrest.

### 2.     Evidence Seized After the Defendant's Arrest

Next, the Defendant argues that evidence obtained during a search of his person following his arrest must be suppressed.  The Court disagrees because the evidence was discovered and seized during a search incident to a lawful arrest.

It is well-settled that a search of an defendant's person pursuant to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.  United States v. Robinson, 414 U.S. 218, 224 (1973).  Arizona v. Gant, 129 S.Ct. 1710, 1716 (2009)("Among the exceptions to the warrant requirement is a search incident to a lawful arrest.")  "A search incident to arrest may lawfully extend to 'the arrestee's person and the area within his immediate control.'"  United States v. Perdoma, 621 F.3d 745, 750 (8th Cir. 2010), cert. denied, 2011 WL 500051 (May 16, 2011).

"An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."  United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007), cert. denied, 552 U.S. 1121 (2008).  The court considers totality of the circumstances based on the information available to the officers at the time of the arrest.  United States v.

Quiroga, 554 F.3d 1150, 1154 (8th Cir. 2009), cert. denied, 129 S.Ct. 2175 (2009) (quoting United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003)).

The officers in this case had probable cause to arrest the Defendant.  Umlauf was familiar with both Ingrid Stanley and the Defendant because of their suspected involvement in narcotics use and dealing.  Umlauf knew that Ingrid Stanley and the Defendant were living together, and that David Stoltz was not a known associate of Ingrid Stanley.  The officers' suspicions were confirmed by a photo comparison; all of the officers agreed that the driver of the vehicle was Jeffrey Stoltz and not David Stoltz.  Given the totality of the circumstances, the officers had probable cause to believe that the Defendant had provided a false name to a police officer.[3] Because the arrest was lawful, the search incident to arrest was also proper.  Therefore, the evidence obtained as a result of the search incident to arrest should not be suppressed.

### 3.    Evidence Seized Pursuant to the Search Warrant

The Defendant also seeks suppression of the evidence obtained during the search of his vehicle pursuant to a search warrant.  The Defendant first argues that the search warrant was not supported by probable cause.[4]  The Court disagrees.  Having reviewed the search warrant and its

---

[3]    Minnesota law states that "[w]hoever with intent to obstruct justice gives the name and date of birth of another person to a peace officer . . . when the officer makes inquires incident to a lawful investigatory stop or lawful arrest . . . is guilty of a gross misdemeanor."  Minn.Stat. § 609.506, Subd. 2.

[4]    The Defendant also argues that the search warrant is fruit of the poisonous tree because it is based upon information that was unlawfully obtained, or derived from unlawful police conduct, in violation of his Fourth Amendment rights.  Because we have rejected his Fourth Amendment challenges to the legality of the traffic stop, the searches of his person, and the arrest, this argument necessarily fails.

supporting affidavit, the Court finds that there was ample  probable cause supporting the issuance of the warrant.

Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place in light of all the circumstances set forth in the supporting affidavit. United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995). The court reviews affidavits in support of search warrants using the "totality of the circumstances" approach, and they must "be read and interpreted in 'a common sense and realistic fashion." United States v. Cadwell, 864 F.2d 71, 74 (8th Cir. 1988), quoting United States v. Ventresca, 380 U.S. 102, 108 (1965). The Court should review the affidavits as a whole and not on a paragraph-by-paragraph basis. United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991). Great deference should be afforded to the decision of the judicial officer who issued the warrant. United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995).

In the affidavit supporting the search warrant, Umlauf recounted the circumstances of the traffic stop the day before, during which the Defendant had given a false name. Umlauf related that shortly before the traffic stop the Defendant had left the residence of a known drug dealer. Umlauf had "extensive information" regarding narcotics dealing at that residence and indicated that two weeks before the traffic stop an individual had been stopped leaving the residence with 7 grams of methamphetamine. Umlauf stated that during a search of the Defendant's person, the officers found a scale, which had field tested positive for methamphetamine, and $741 in cash, which was consistent with narcotics dealing. Umlauf also stated that multiple confidential informants had provided information that the Defendant and Ingrid Stanley were selling methamphetamine from their residence in Brandon, Minnesota. Umlauf addvised that the Defendant's criminal history included three prior drug charges between 1981 and 1999. Based

on this information, Umlauf stated his belief that the Defendant had been trafficking narcotics in his vehicle, and that a search of the vehicle would reveal further evidence of narcotics crimes.

The Court is persuaded that this information establishes a fair probability that contraband or evidence of a narcotics crime would be found in the vehicle the Defendant was driving. The search warrant also described with particularity the vehicle that was to be searched and where that vehicle was located, and further enumerated the items to be seized, as required by the Fourth Amendment. See, United States v. Gamboa, 439 F.3d 796, 806 (8th Cir. 2006), cert. denied, 549 U.S. 1042 (2006). The Defendant has not otherwise identified any specific defects in the warrant. As such, the Court finds that the search warrant satisfies the Fourth Amendment.[5]

The Defendant also seeks to suppress the contents of the Defendant's wallet on the grounds that their seizure exceeded the scope of the search warrant. The Court disagrees.

The search warrant authorized the officers to search the vehicle for "**receipts** . . . bank statements and related records, pass books, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks" and other documents "evidencing the obtaining, secreting, transferring, concealment, and/or expenditure of money." It was reasonable for the officers to believe that financial documents of this nature would likely be found in the a wallet, where receipts and checks are often stored. See, United States v. Weinbender, 109 F.3d 1327, 1329 (8th Cir. 1997)("A lawful search extends to all areas and containers in which the object of the

---

[5]     Even if the information in the search warrant was insufficient to establish probable cause, the Court would be compelled to find that suppression would be improper under the "good faith exception" articulated in United States v. Leon, 468 U.S. 897, 922-23 (1984). The officers' reliance upon the search warrant was reasonable because it was not "so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999).

search may be found.").   Accordingly, upon discovering the Defendant's wallet, the officers were permitted to search the contents pursuant to the plain language of the search warrant.   The pawn receipts found inside clearly fall within the scope of the above language, and therefore, the officers were authorized to seize the receipts as evidence of financial transactions.

The Court is also persuaded that the seizure of the receipts was justified by the plain view doctrine.   Under the plain view doctrine, law enforcement officers may "seize evidence without a warrant when (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,' (2) the object's incriminating nature is immediately apparent, and (3) the officer has 'a lawful right of access to the object itself.'" United States v. Hughes, 940 F.2d 1125, 1126-27 (8th Cir. 1991), cert. denied, 502 U.S. 896 (1991) (quoting Horton v California, 496 U.S. 128, 136-37 (1990)).   The officers gained lawful access to the wallet, and the contents of the wallet, under a properly issued warrant.    Parshall immediately recognized the incriminating nature of the receipts as he was aware that the Defendant is not authorized to possess firearms based on his prior criminal history.   Therefore, the seizure of the pawn receipts was also justified under the plain view doctrine.

The Court finds that the issuance of the search warrant was proper and that the officers did not exceed the scope of the warrant when they seized the two pawn receipts.   Therefore, the motion to suppress evidence seized during the execution of the search warrant should also be denied.

### B.   Motion to Suppress Statements, Admissions, and Answers

Defendant moves to suppress the statement he provided to Deputy Sorenson at the Pope County Sheriff's office following his arrest on November 16, 2010.   The Defendant argues that

the statement was the result of an unlawful detention, search, and arrest, and therefore, the statement must be suppressed as fruit of the poisonous tree.

"Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." United States v. Craig, 630 F.3d 717, 722 (8th Cir. 2011) (quoting United States v. Yousif, 308 F.3d 820, 832 (8th Cir. 2002); see also, Wong Sun v. United States, 371 U.S. 471, 485-86 (1963)(statement derived from unlawful entry and arrest can be fruit of the poisonous tree). The Court already concluded that the Defendant's initial detention, the searches of his person, and his arrest, did not violate his Fourth Amendment rights. Accordingly, the statement does not constitute fruit of the poisonous tree, and the motion to suppress his statement should be denied.[6]

### C.      Motion to Suppress Eyewitness Identifications

The Defendant moves for the suppression of the identifications of the Defendant by the Viking Pawn Shop employees. The Defendant argues that the identifications violated his due process rights because the procedure used was unduly suggestive.

The courts employ a two-step analysis to evaluate a challenge to an identification on due process grounds. United States v. Gipson, 383 F.3d 689, 698 (8th Cir. 2004). First, "a defendant "must show that the identification procedure was impermissibly suggestive." United States v. Staples, 410 F.3d 484, 487 (8th Cir. 2005), quoting Simmons v. United States, 390 U.S. 377, 384 (1968). "If it was, we must then determine whether, under the totality of the circumstances, the

---

[6]      The Defendant has not argued that the statement was taken in violation of his Miranda rights. See, Miranda v. Arizona, 384 U.S. 436, 444 (1966).

suggestive procedures created 'a very substantial likelihood of irreparable misidentification."
United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991) (quoting Manson v. Brathwaite,
432 U.S. 98, 116 (1977)).

The Court recognizes that using a single photograph of a defendant for identification
purposes is often deemed impermissibly suggestive.  See, e.g., United States v. Patterson, 20
F.3d 801, 806 (8th Cir. 1994), cert. denied, 513 U.S. 845 (1994).  However, the Eighth Circuit
has recognized that "when someone already familiar with a suspect is asked to comment on
whether a recorded voice or image portrays the suspect," the concerns that are normally
attendant to witness identifications of a stranger are absent.  United States v. Dobbs, 449 F.3d
904, 910 (8th Cir. 2006), cert. denied, 549 U.S. 1233 (2007).  While the procedure in this case
may have been suggestive in that it relied on a single photograph, the procedure was not
"impermissibly suggestive."  In Dobbs, a surveillance tape of a convenience store robbery was
shown to individuals who were acquainted with the defendants, and they identified the
defendants as the suspects on the videotape.  The court determined that the Dobbs case was
distinguishable from other cases dealing with single photo identifications, because "[t]he women
who identified [the defendants] on the tape were not eyewitnesses being asked to recall their
impression of a stranger during a short encounter in the emotionally charged context of an armed
robbery," but "were individuals already acquainted with [the defendants]."  Dobbs, 449 F.3d  at
909-10.

In the present case, the employees testified that they clearly recalled the transaction in
question because the Defendant had recently returned to the pawn shop in an attempt to retrieve
the firearms.  The employees indicated that the  Defendant had first refused to submit to the
NICS check and then brought in an individual who **failed** the NICS check.  These circumstances

were highly unusual, and this created a memorable impression with the employees.  In addition, the Defendant had been in the pawn shop several times in order to make the original pawns of the firearms, and subsequently to make payments toward recovering the pawned items.  The employees were also familiar with the Defendant's girlfriend, Ingrid Stanley, who had also came into the shop to pawn items in the recent past.  Accordingly, this is not a case in which an eyewitness saw a suspect for an exceedingly short period of time on a single occasion while under stress.  Rather, the employees interacted face-to-face with the Defendant on several occasions.  As such, the Court concludes that the pawn shop employees were clearly previously acquainted with the Defendant, and accordingly, the use of a single  photograph to identify the Defendant under circumstances of the case was not improperly suggestive.

Even if the circumstances of the identification were impermissibly suggestive, the Court would still find that the identifications were reliable and **did not** create a substantial likelihood of misidentification.  The factors to consider in evaluating the likelihood of misidentification include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114.  As already discussed above, the witnesses had the opportunity to view and speak with the Defendant face-to-face on several occasions, the witnesses were familiar with the Defendant as well as his girlfriend, the witnesses were certain that the photograph displayed the Defendant, the witness's recent transactions with the Defendant where he attempted to retrieve the pawned firearms were unusual and clearly stood out in their minds as memorable, and only two weeks had passed since their last interaction with the Defendant.     For these reasons, the Court finds that the identification of the Defendant was reliable and unlikely to have

resulted in misidentification.   Therefore, the Defendant's motion to suppress eyewitness identifications should be denied.

## III.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.   Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 25] be **DENIED**;

2.   Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 26] be **DENIED**;

3.   Defendant's Motion to Suppress Eyewitness Identifications [Docket No. 27] be **DENIED**.


Dated: June 3, 2011                                    s/Leo I. Brisbois
                                                       LEO I. BRISBOIS
                                                       United States Magistrate Judge

## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by June 17, 2011,** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.